## Case No. 14,083.

### TOME et al. v. FOUR CRIBS OF LUMBER.

[Taney, 533.] [1]

Circuit Court. D. Maryland. Nov. Term, 1853.

SALVAGE—LUMBER RAFTS—DERELICTS—PRACTICE
IN ADMIRALTY—WRIT OF RESTITUTION.

1. Where rafts of lumber, anchored in the Susquehanna river at Port Deposit, within the

[1] [Reported by William P. Mason, Esq.]

[1] [Reported by James Mason Campbell, Esq., and here reprinted by permission.]

flux and reflux of the tide, are driven from their anchorage by a high wind and tide, but are not broken up, and whilst floating down the stream, are rescued and brought to the shore: *Held,* that this is not a salvage service.

[Cited in Raft of Cypress Logs, Case No. 11,-527. Disapproved in Maltby v. Steam Derrick Boat. Id. 9,000. Cited in Cope v. Vallette Dry-Dock, 10 Fed. 145; Id., 119 U. S. 630, 7 Sup. Ct. 338.]

2. The person so rescuing it acquires no lien on the lumber, and has no right to retain it from the owner; his remedy is an action at law to recover the value of the service rendered.

[Criticised in Fifty Thousand Feet of Timber, Case No. 4,785.]

3. This is one of the usual accidents of the lumber trade; if the owners choose to expose their property to the risk, they have a right to do so, and no one can acquire a lien upon the lumber by interfering with it without their authority.

[Approved in Bywater v. A Raft of Piles, 42 Fed. 918.]

4. Although no one was on the raft, yet, it was no derelict on that account, or abandoned by those who had the care of it; for it is not the usage of the trade to keep any one on board, while the raft is at anchor.

5. Such service has none of the qualities or character of the services for which the maritime law of all commercial nations allows salvage, when the property is in danger of perishing from the perils of the sea.

6. When a raft is broken up and scattered, any one may lawfully take measures to save it from further loss, and secure the property for the owner; but it is rather a case of finding, than of salvage service; and whatever just claim the party may have to a reasonable compensation for his service and time, he has no right to retain the property when the owner demands it; and if he does, it may be recovered in an action of replevin, in a court of common law.

[Cited in Chase v. Corcoran, 106 Mass. 288.]

7. Rafts anchored in the stream, although it be a public navigable river, are not the subject-matter of admiralty jurisdiction, in cases where the right of property or possession is alone concerned; they are not vehicles intended for the navigation of the sea or arms of the sea; they are not recognized as instruments of commerce or navigation, by any act of congress; they are piles of lumber, and nothing more, fastened together and placed upon the water until suitable vehicles are ready to receive and transport it to its destined port; and any assistance rendered to these rafts, even when in danger of being broken up, and swept down the river, is not a salvage service, in the sense in which that word is used in courts of admiralty.

[Cited in The W. H. Clark, Case No. 17,482. Applied in Salvor Wrecking Co. v. Sectional Dock Co., Id 12.273. Followed in Gastrel v. Cypress Raft. Id. 5,266. Distinguished in Muntz v A Raft of Timber, 15 Fed. 557. Cited in Snyder v. A Floating Dry Dock, 22 Fed. 686; Cartier v. The F. & P. M. No. 2, 33 Fed. 511; Ruddiman v. A Scow Platform, 38 Fed. 159; Seabrook v. Raft of Railroad Cross-Ties, 40 Fed. 596.]

8. The remedy of the owners of the lumber in this case, to regain the possession, from the party claiming salvage, was an action of replevin, and not a libel in the district court.

9. The lumber having been taken from the respondent's possession by process which the district court had no jurisdiction to issue, a writ of restitution would be awarded, if there was any question between the parties as to the right of property or of possession, which this court considered an open one; but as the respondent claims no property in the lumber, but merely the right to retain the possession until paid for services which were not of a nature to give him that right, it would be unreasonable and unjust to deprive the owner of the possession he has obtained, merely to subject him to the necessity of recovering it again, in a new suit in a court of common law.

[Appeal from the district court of the United States for the district of Maryland.]

This case was instituted in the district court on the 18th of June 1852. The libellants (now appellants), were Jacob Tome and Edward Rhinehart, lumber-merchants of Port Deposit, trading under the name of Tome & Rhinehart, agents and consignees of William Hartley, of the state of Pennsylvania, and the said William Hartley. The libel was against four cribs of lumber, and the contents thereof, in Harford county, in the state of Maryland, and against Albert Davis of the same county, in a cause of spoliation, and damage, civil and maritime.

The libellants alleged that on the 17th of April 1852, they, the said Tome & Rhinehart, as agents and consignees as aforesaid, were possessed of two rafts of lumber containing twenty cribs or platforms, and in all 100,000 feet of lumber, which was at that time anchored in the Susquehanna river, near Heckertown, in Cecil county, within the district aforesaid, and within the flux and reflux of tide, and the admiralty and maritime jurisdiction of this court. That on that day, the said lumber, so safely anchored, was carried down the river, about five miles, by the wind and current, in a freshet, to the opposite side of said river, near the shore of one Stephen I. Thompson, of Harford county; and on the 20th of May, the libellants Tome & Rhinehart, sent vessels and hands down the river to the said lumber, with a view to have the same put on board the vessels, to carry them to Baltimore and the District of Columbia, to Smith, Barnett & Co., and others, to whom the libellants had sold the same. That by their said hands and agents, they had succeeded in putting all of the lumber alongside of the vessels, preparatory to putting it aboard, when the said Albert Davis, with his servants and agents, came from his shore in a boat, armed with a gun, and threatened to shoot and otherwise violently to disturb and injure the libellants' agents and servants, if they resisted, and finally against their will, cut away violently from the said lumber, four cribs or platforms thereof, by severing the ropes which bound them to the other lumber and the said vessels, and carried them to the shore of the said Albert Davis, and he has since had the said lumber drawn and piled on his farm lying in the said county, and fronting on the said river, next above the farm of the said Thompson. That after the said Albert Davis had taken away the lumber (worth about $200), he pretended that he was entitled to salvage for saving the two rafts, and demanded therefor

$150, and also endeavored, by the like violence, to prevent the rest of the said lumber from being put on board the said vessels, under the said pretence. That the said claim for salvage, was a mere pretence to cover and excuse the said spoliation and trespass; for the said two rafts having been anchored as aforesaid, were cast loose by the rise of the river, and carried down, by the current and wind, to the shallow water opposite to the shore of the said Thompson, where the anchor again performed its office; and all the said lumber was perfectly safe and free from all kind of danger, except that incident to lumber afloat as it was at Heckertown; and if the libellants had been present, they would have prevented any person from interfering therewith. That all of it was staunch and tight (no rope or fastening having been broken or disturbed), and would have so continued, but that the said Albert Davis (not with a view to save it, but with a view to draw it to his own shore, and there possess himself of it, in order to extort money for delivering it up) boarded the rafts and cut the fastenings, whereby about fourteen cribs went ashore, and three of them were carried down the river as far as Swan creek, so as to expose the libellants to risk and expense; which said cribs the said Davis made no effort to recover or secure. And the other cribs so cut away from their fastenings, went ashore on the said Thompson's land, and so remained, in a situation more exposed than they were while attached to the anchor as aforesaid. That it is the usual manner of preserving rafts of lumber in the Susquehanna river, within the flux and reflux of tide, and within the admiralty and maritime jurisdiction of this court, to anchor the same until they are drawn or piled up on land; and the said Thompson's shore is only about five miles below Heckertown; and the said lumber thus secured by the anchor, was just as safe and required no further interference with than at Heckertown; and was actually put at greater risk, and was in no manner saved or secured by anything done by the said Davis. That the libellants, Tome & Rhinehart, having been for many years engaged in the lumber trade, and having frequently before had lumber carried by wind and freshet to some point below Port Deposit in the said river, had always been in the habit of making liberal allowances to such persons, as gave themselves any trouble about their lumber; although they always preferred that they should not interfere with it, as lumber was always put at more risk by unskilful handling; and with that view the libellant Tome, about the 30th of April (on his return from New York, where he was at the time of the freshet), on hearing that Davis had been upon the lumber, called upon him, but not finding him at home, left word with his sister, informing her that the libellants were the owners of the lumber, as agents as afore-

said, and offering to pay any reasonable sum for such trouble, as the said Davis or his hands might have been put to in doing what they might have conceived necessary for the benefit of the said lumber. That they never received any demand from the said Davis, but before the 20th day of May aforesaid, they sent a letter to said Thompson, making a similar offer for any person concerned, which letter they believed and charged the said Thompson showed to Davis; and on the said 20th day of May, the libellants sent the vessels and hands for the lumber, in the manner above mentioned, never suspecting for a moment that there would be the least difficulty, as the said Davis well knew that they were the owners of the lumber, and were willing and able to pay whatever was reasonable for his services.

And they averred, that by reason of the said spoliation by the said Davis, and the threats and violence he used in endeavoring to prevent the rest of the lumber from being put on board the vessels, the said vessels and hands, as well as the other servants and agents of the libellants, were delayed at a heavy expense. The libellants were not able to fulfil their contract with the said Smith, Barnett & Co., in Baltimore, and with others in the District of Columbia, and so in both ways had been subjected to a loss, in the shape of damages, of at least $150. That the libellant Tome, notwithstanding the bad conduct of the said Davis and his bad faith respecting the said lumber, and notwithstanding the libellants had been injured instead of being benefited by his interference therewith, yet, for the purpose of obtaining the said lumber without the expense of litigation, offered and tendered to him $25 for his trouble, if he would give up the said four cribs, which he declined to do. That the said Davis never had taken any steps to obtain salvage, and never made any demand therefor, until after he had taken away the four cribs, when he demanded $150. That the said four cribs of lumber had been drawn and piled on the farm of the said Albert Davis, in Harford county within the district aforesaid, and were now there, though the libellants had been informed and believed, and so charged, that the said Davis had been using and consuming the same as if it were his own; so that the whole thereof might not be there, but they were advised that for any deficiency he would be responsible to them. That all of the said lumber was worth between nine hundred and one thousand dollars; and if the said Davis had fixed upon any reasonable demand for salvage, the said libellants would either have paid the same, however improperly demanded, or left sufficient of the said lumber to meet the said demand; but that the whole of the proceedings on the part of the said Albert Davis were designed, by taking the law into his own hands, and subjecting the libellants to heavy and unusual and unnecessary ex-

penses, to extort money from them. Whereby and by the said act of spoliation, the libellants said they had been injured, besides the value of the said four cribs of lumber, in the sum of $150, as aforesaid.

Prayer for restoration of the lumber, and compensation in damages.

Albert Davis, in his answer, stated that he had no knowledge of what lumber the libellants had anchored in the Susquehanna river near Heckertown, on the 17th of April, 1852, and left them to their proof thereof. That he did not know, of his own knowledge, whose lumber had broken away in the Susquehanna river, and came down the bay on the 18th of April, but it was true, as alleged by the libellants, that they sent vessels down, about the 20th of May, to carry the same away. That early in the morning of the 18th of April last, when a very heavy easterly storm was raging, he discovered one raft of lumber drifting down the bay, and along and near the shore, which his servants secured and tied to the adjoining shore of Stephen I. Thompson; that said lumber had no anchor attached to it, and when secured by his servants, was in great danger of being scattered by the violence of the storm, and broken up on the shores of Swan creek, into which the storm was sweeping with great force. That about eleven o'clock of the same day, he saw another raft drifting down the bay; that he boarded the same, and found that it was dragging its anchor; that it was fast breaking up, but he secured the fastenings, so that it only parted in two parts; one part, consisting of five cribs. he secured on his own shore, and the other part, he secured with the anchor, a short distance from shore. That having thus secured this lumber, he went in two or three days afterwards, to Havre de Grace, and put up public notices in several places in that town, giving notice that he had secured and saved this lumber, and requesting the owners to apply to him for the same. That some two weeks after this notice was set up, he learned that libellants claimed the lumber, and about the 20th of May, a vessel came down to carry it away, but without the knowledge of respondent, and without having tendered him any compensation for his services in saving it. That on being told that the agents of the libellants, had taken the lumber from the shore, and were about to put it on board of their vessel, he immediately went out to them and forbade their doing so, without first proving it to be the lumber of the libellants, and paying respondent his salvage for securing the same. That they refused to pay anything, and persisted in their efforts to carry away said lumber, when the respondent cut loose four cribs, and carried them back to the shore, and told the libellants' agents, that he would return the same upon the payment of a reasonable salvage, which he thought would amount to $150. That respondent had his gun in the boat with him, but he never threatened to shoot or injure any one; but the master of the vessel had a gun, and threatened frequently to shoot respondent. That he placed those four cribs of lumber on his shore, where they remained safely, untouched by any one, until taken by the marshal under the process issued in this case; and the balance of said lumber was taken away by the libellants. That the whole lumber secured by him was worth about $1000, and he deemed himself clearly entitled to $150 for salvage, and demanded that sum. That the salvage was not claimed as a mere pretence and excuse, but he was justly entitled to the same, as the lumber, when secured by him, was in great danger of being scattered and broken up, and if the wind had shifted to the north or northwest, it would have been carried down the bay and probably lost; and his sole object in boarding the said raft, was to secure the same, and save the lumber for the owners. That the last-mentioned raft had come loose in several of its fastenings, which he secured, and he denied that he cut loose any fastenings, or in any other manner did anything to separate the same. That it was true, that one of the libellants called in April last, at the respondent's house, and not finding him at home, informed his sister that the libellants were the owners of the lumber, but he had no knowledge of any offer made to his sister by said libellants to pay any reasonable sum to respondent for his services. That he was never shown any letter by said Thompson, containing any offer of the said libellants, and when they came to take away said lumber, no offer was made to pay respondent for his trouble in securing the same; that said Tome subsequently offered him $25, which he refused, deeming it entirely inadequate to compensate him for his services; that as soon as the agents of the libellants came to claim the lumber, respondent made his claim for salvage to the amount above mentioned. That he caused the said four cribs of lumber to be piled up in a place of safety on the shore; that no part of the same was used by him or his servants or any other person to his knowledge; and that the loss, if any, which might have accrued to the libellants by reason of respondent's refusal to deliver them the four cribs of lumber, might have been avoided by their paying him his reasonable demand for salvage.

The notice referred to in the above answer, was as follows:

"Notice.—On the 18th of April, was taken adrift, a number of platforms of lumber. Apply to Albert Davis."

On the 10th of December, 1852, the district court (Glenn, J.) passed a decree for the sale of the lumber, directing that the defendant, Davis, should be paid out of the proceeds the sum of $150 for salvage; each party to pay his own costs. From this decree, the libellants took an appeal.

In addition to the evidence offered in the

court below, the depositions of several witnesses were read at the hearing of the appeal, the substance of which, is fully detailed in the opinion of the court.

Cornelius McLean and Geo. W. Williams, for libellants.

Wm. F. Giles, for respondent.

TANEY, Circuit Justice. This dispute has arisen from a claim of salvage made by the appellee, for saving, as he alleges, two rafts of timber belonging to the appellant, Hartley, and consigned to Tome & Rhinehart, his agents, at Port Deposit.

These rafts had been floated down the Susquehanna river, and anchored in the stream below Port Deposit; while they remained thus at anchor, a sudden rise in the river took place, accompanied by a high wind and heavy sea, which floated the rafts from the place where they were anchored, and carried them with the current down the river. The respondent, Davis, owns a farm bordering on the river, about five miles below the place from which the rafts had floated off. As they descended the river, they passed near his shore; and the first that came down was taken possession of by his servants, by his direction, and fastened by a chain to a tree; it was, however, fastened to the shore of Stephen I. Thompson; who owns the farm immediately below that of Davis; the current having swept the raft a little below Davis's line, before its motion was arrested. When the second raft came down, which was a few hours afterwards, Davis boarded it, at some personal risk; and while he was on it, five cribs broke off, which he drew to his own shore and fastened there; the residue of the raft was held by the anchor attached to it, after being drawn by Davis into shallow water. There is some difference in the testimony as to the cause of the separation of these five cribs from the residue of the raft, while Davis was on board. But it is not necessary to examine this question; for in the view which the court take of this controversy, it is immaterial whether, as he alleges, the raft was about to break up when he reached it; or, as the appellants insist, the cribs were separated by him.

Three of the five cribs anchored off his shore, broke loose from the other two, and floated down to Swan creek, where they were afterwards found safe, and recovered by the owners, when they came with their vessels to take away the lumber; the residue remained at the place above mentioned, until the owners came for it. Davis put up an advertisement at Havre de Grace, immediately after he had taken up the lumber, stating that he had done so, and requesting application for it to be made to him; and he was shortly afterwards informed by an agent of the libellants that it belonged to them. It remained for some weeks. It was plank, or what is usually called boards; and was destined, part for Baltimore, and part for the District of Columbia. It was suffered to remain so long, because it is more convenient to load it on vessels in high water, when it can be floated off from the shore without breaking up the cribs.

As soon as the state of the water became favorable, the libellants sent their agents with two vessels to take the lumber, and carry it to the places where they had engaged to deliver it. They took the raft from Thompson's shore without any opposition from him, or any demand for compensation; they also took the five cribs which had been fastened by Davis to his own shore, and attached them to the rest of the lumber, and were engaged in lading the vessels, when Davis came on the raft, and insisted that the plank should not be taken away until he was paid salvage for his services; he was offered twenty-five dollars, which he refused, and demanded one hundred and fifty. And upon this disagreement, a scene of violence, by no means creditable to either party, ensued, in the midst of which, Davis succeeded in detaching four cribs from the raft, by cutting the fastenings; he took them to his shore, and drew the plank from the water, and piled it on his land; claiming the right to retain it until he was paid the sum he demanded for salvage.

The owner, and the agents to whom he had consigned it, thereupon filed this libel in the district court, praying that this lumber might be delivered to them, and Davis compelled to pay damages for its detention. Process was accordingly issued, and the plank delivered to them by the marshal; and a monition in the usual form served upon Davis, who appeared and put in his answer; he insists on his claim of one hundred and fifty dollars for salvage, and his right to retain the property until it is paid.

The district court was of opinion that he had rendered service to the libellants, in saving these rafts, of the value claimed by him; that they were salvage services which gave him a lien on the property; and directed these four cribs to be sold, and the sum above-mentioned to be paid to the respondent out of the proceeds. From this decree the libellants have appealed to this court.

The sum in dispute is a small one; but this question is important, from the great quantity and value of the lumber annually brought down the Susquehanna river, and anchored in the stream at or near the place from which these rafts floated. One of the witnesses states that in the month of May, 1852, he saw from one hundred to one thousand anchored there; all of them being more or less liable to be swept down the river by a sudden rise in the waters.

The course of the trade is this: In order to send it down the river, it is in the first place put up in cribs, varying, in some degree, in size, but most commonly about sixteen feet square; they are strongly secured

so as to keep the lumber together; a number of these cribs (generally about ten) are then strongly fastened to each other, and form what is called a raft. In this state it is floated down to Port Deposit, and remains there until it is sold, or the owner prepared to transport it to another market; when it is to be transported to any of the great lumber markets, either by the purchaser or original owners, it is either laden in vessels from the rafts, which are brought alongside for that purpose, or formed into what is called a float, and floated to its place of destination.

A float, in the language of the trade, means two or more rafts attached together, and prepared, by proper fastenings and suitable arrangements, to withstand the winds and waves of wider waters; but the lumber is not often transported in this condition, except to Baltimore. The rafts which first come down in a rafting season are usually fastened near the shore, at Port Deposit; when that space is filled up, those that follow are anchored in the stream, and often remain anchored there for some weeks, before the lumber is transported to another market.

As I have already said, while they remain in this condition, they are always liable to be swept from their anchorage by a sudden rise in the river; but the owners are, of course, well aware of this danger, and willing to encounter it; because the winds and currents almost invariably drive them into shallow water, where the current is not so strong, and where the anchor attached to the raft will again take hold and keep it anchored until the owner desires to remove it. All of the witnesses engaged in this trade say that they regard the risk of losing their lumber by this means as a small one; for the raft very rarely breaks up, or floats into the Chesapeake Bay; and that they are very unwilling that any one, without their authority, should interfere with it, as it drifts down the river, or haul it to the shore. They prefer to take the chances that the anchor will again take hold because the raft is apt to be broken by thumping on the shore, when fastened in water too shallow, and in a place exposed to the waves; and that the lumber is in some degree injured, if improperly handled when piling it on to land, and more expensive and troublesome to put on board of vessels, than it would be if anchored out in the river. When the raft is missed from the anchorage at which they placed it, their own agents are sent to look after it and see that it is secured in a place of safety; but where they find that any one has rendered them a service in this respect, before their agents arrive, they are accustomed to pay them a reasonable compensation for their trouble.

Now, the first question before the court in this case, is, not whether Davis rendered a service or not, or what is the value of his service, but whether that service was a salvage service or not. For, if it was not a salvage service, then he has no lien on the lumber, and had no right to detain it from the owner; his remedy would be an action at law to recover the value of the service he rendered.

And I think this is not a case for salvage. The water in the river had risen, and a heavy wind was blowing, and these rafts were driven from their anchorage; but they had not broken up, when he boarded them, and were floating down the stream. It was one of the usual accidents of the trade; and if the owners choose to expose their property to this risk, they have a right to do so, and no one can acquire a lien upon it by interfering with it without their authority. It is true, no one was on the raft; but it was no derelict on that account, or abandoned by those who had the care of it, for it is not the usage of the trade to keep any one on board while the raft is at anchor.

The case of The Upnor, 2 Hagg. Adm. 3, was a stronger case than this in favor of salvage. The Upnor was a flat-bottomed barge, loaded with manure, which was found on a sand-bank, with the water over the upper dead-eyes of the shrouds, the sails (except the mizen) washing about, no person on board, and no anchor out; she was boarded in that condition, with much difficulty, by some men who took her to Sheerness, and claimed salvage for their services. It was proved, that it was a common case for vessels to be left on that sand, until the owners could procure assistance, and that the master and a lad who navigated her had made all safe, and then went to the owner to have assistance sent to her. Lord Stowell refused salvage, saying that individuals who thus choose to expose their property to the chances of wind and weather, have a perfect right to exercise their own discretion upon the matter, and that other persons are not entitled to interfere.

The case of Nicholson v. Chapman, 2 H. Bl. 254, is still more analogous to the case before the court. In that case, a quantity of timber was placed in a dock, on the banks of the Thames, but the ropes by which it was fastened got loose and it floated off, and was carried by the tide to some considerable distance, and left at low water upon a towing-path; it was removed to a place of safety, at some distance, and the party who took care of it claimed salvage for his services, and a lien for them on the timber. But the court held, that taking care of timber in that situation, although on a navigable river, and within the flux and reflux of the tide, did not entitle the party to salvage, nor give him a lien upon the property for his services; that the service had none of the qualities or character of the services for which the maritime law of all commercial nations allowed salvage, when the property was in danger of perishing from the perils of the

sea. The case under consideration comes within the distinction taken in the case referred to. The rafts are prepared to float the timber down the current of the narrow part of the river; but they are not prepared or intended to encounter sea perils; the lumber is placed in vessels, or in floats, before it is exposed to the winds and waves of the Chesapeake Bay; and in that condition it is usually transported to the places for which it is destined. If the raft is carried off from its anchorage by the rising of the river and high winds, the owner knows what direction it will most probably take, and where to look for it; and even if the rafts and cribs are all broken up and cast, in separate pieces, on the shore, the quality of the lumber is not much injured, and if never found by the owner, his loss is occasioned rather by floods from the land than the perils of the sea.

If salvage were allowed, in such cases, to every one who chose to interfere, and take possession of the rafts which he saw floating down the river, property of great value might, and probably would, often be withheld from the owner, upon claims for salvage services; and this, too, under circumstances where the owner would have desired that the party should not interfere; and where the service, if any was really rendered, cost him very little time or trouble. And we might, moreover, have a libel in admiralty for salvage, upon every piece of timber cast on the shore from a broken raft.

Undoubtedly, when a raft is broken up and scattered, any one may lawfully take measures to save it from further loss, and secure the property for the owner; but, as was said by the court in the case of Nicholson v. Chapman, it is rather a case of mere finding than of salvage service; and whatever just claim the party may have to a reasonable compensation for his trouble and time, he has no right to detain the property when the owner demands it; and if he does, it may be recovered in an action of replevin, in a court of common law.

The result of this opinion is, that these rafts, anchored in the stream, although it be a public navigable river, are not the subject-matter of admiralty jurisdiction, in cases where the right of property or possession is alone concerned. They are not vehicles intended for the navigation of the sea, or the arms of the sea; they are not recognised as instruments of commerce or navigation by any act of congress; they are piles of lumber, and nothing more, fastened together and placed upon the water until suitable vehicles are ready to receive and transport it to its destined port. And any assistance rendered to these rafts, even when in danger of being broken up, or swept down the river, is not a salvage service, in the sense in which that word is used in the courts of admiralty. And this seems always to have been the view taken of this subject; for, notwithstanding the great extent of this trade, and

the number of years it has been carried on, this is the first instance in which a claim for salvage has been made in the court of admiralty, for arresting a raft which was driven from its anchorage. The district court, therefore, had not jurisdiction to issue the process by which the marshal was directed to take the property from the possession of the respondent; the controversy was proper for the decision of a court of common law, and the remedy of the owners to regain the possession, was an action of replevin, and not a libel in the district court; consequently, its decree must be reversed, and the libel also dismissed.

The lumber having been taken from the respondent's possession, by process which the district court had not jurisdiction to issue, a writ of restitution would be awarded, if there was any question between them, as to the right of property, or the right of possession, which this court considered as an open one. But the respondent claims no property in the lumber; he claims the possession only, upon the ground that the services he rendered were salvage services, under the maritime law. And as the court is of the opinion that the services were not of that character; and that he had no right to withhold the property from the owners; it would be unreasonable and unjust to deprive the owner of the possession he has obtained, merely to subject him to the necessity of recovering it again in a new suit, in a court of common law. The court will not, therefore, disturb the possession of the libellants; but as they brought the controversy into the court of admiralty, and have failed to support their libel, they must be charged with costs, as well in this, as in the district court.